CONSERVATION LAW FOUNDATION,

    Plaintiff,

        v.                                Civil Action No. 13-821 (JEB)

PENNY PRITZKER, *et al.*,

    Defendants.

## MEMORANDUM OPINION

The Magnuson-Stevens Fishery Conservation and Management Act created an accountability system to ensure that our nation's waters are not drained of their resources. Among other things, the Act requires regional Fishery Management Councils to set Annual Catch Limits for fishing off America's shores. Those ACLs set ceilings on the amount of particular stocks of fish that can be harvested in a given year. Each Council has a Scientific and Statistical Committee (SSC) that recommends maximum fishing levels for the year, and the ACLs ultimately set by the Council cannot exceed the Committee's recommendations. After determining suitable ACLs, the Council submits its proposed catch limits to the National Marine Fisheries Service for review and approval before the limits become law.

This case revolves around Framework 50, a suite of measures that made adjustments to New England's Multispecies Fishery Management Plan. In its lawsuit and ensuing Motion for Summary Judgment, Plaintiff Conservation Law Foundation contends that the Service should not have approved the Framework and issued its accompanying rule because the rule set catch limits that exceeded the SSC's expert recommendations. In its Cross-Motion, the Service and its co-Defendants, the Secretary of Commerce and the National Oceanic and Atmospheric

1

Administration, argue that CLF is mistaken: Framework 50 set ACLs below the Committee's recommendations. But the Framework and its implementing rule also tacked on an additional amount of fish that vessels are allowed to catch over and above the ACL, and this "total potential catch" – the ACL plus the bonus catch – did indeed exceed the Committee's recommended limits. As a result, the Court will grant CLF's Motion in part and vacate the portion of Framework 50 and its associated rule allowing bonus or "carryover" catch in an amount that exceeds the SSC's proposed ceiling.

CLF also challenges the ACL set for one particular stock of fish, Gulf of Maine cod. As the decisions made by the Service in setting that catch limit were reasonable and comport with the Act, however, the Court will grant the Government's Cross-Motion in part and uphold the Service's actions on that question.

## I. Background

Because fishing regulation under the Magnuson-Stevens Act is a complicated business, the Court begins by outlining the most relevant regulatory provisions governing fisheries. In doing so, it assumes some familiarity with its recent opinion in Oceana, Inc. v. Pritzker, No. 13-770, 2014 WL 616599 (D.D.C. Feb. 18, 2014). The Court is also issuing a related Opinion today in Conservation Law Foundation v. Pritzker, No. 13-820 (D.D.C. Apr. 4, 2014).

The Magnuson-Stevens Act, Pub. L. No. 94-265, 90 Stat. 331 (1976), amended by Pub. L. No. 109-479, 120 Stat. 3575 (2007), created a fishery-regulation regime designed to "conserve and manage [U.S.] fishery resources" and to "promote domestic commercial and recreational fishing under sound conservation and management principles." 16 U.S.C. § 1801(b).[1] Two entities are responsible for the pursuit of those goals. First, the National Marine Fisheries

_____

[1] Title 16 of the U.S. Code was in the process of revision for the 2012 edition at the time of briefing, a process that has recently been completed. To avoid confusion, the Court uses the version of the Code cited in the briefs – the 2006 edition.

Service has been delegated ultimate authority over federal fishing policy and oversight.  See id.

§ 1802(39); id. § 1854 (allocating responsibility to Secretary of Commerce or her designee);

Oceana, Inc. v. Locke, 831 F. Supp. 2d 95, 101 (D.D.C. 2011) (noting delegation to Service).  In

addition, eight regional Fishery Management Councils work with the Service to monitor specific

fisheries throughout the United States.  See 16 U.S.C. §§ 1852(a), (h).

The Councils' and Service's efforts are guided by individual Fishery Management Plans

and related regulations.  Each Council must develop and maintain a Plan for each fishery under

its control, and those Plans and related regulations must ultimately be approved, implemented,

and enforced by the Service.  See id. §§ 1852(h), 1854(a).  Proposed regulations and other

actions must be consistent with the requirements of the Act and with the Act's ten National

Standards or goals.  See id. §§ 1853(a), 1854(a).  To keep management measures up to date, the

Councils and the Service occasionally publish Amendments, which are incorporated into Plans

after notice and comment and alter fishery management in broad strokes, see id. § 1854(a), and

Framework Adjustments, which are expedited actions that modify fishing oversight in more

modest ways.  See id. §§ 1853(c), 1854(b); 50 C.F.R. § 648.90(c).

In this case, CLF is suing the Service and other government Defendants over a

Framework Adjustment and related rule concerning the Northeast Multispecies Fishery

Management Plan.  See Framework 50 Interim Final Rule, 78 Fed. Reg. 26,172 (May 3, 2013);

Framework 50 Final Rule, 78 Fed. Reg. 53,363 (Aug. 29, 2013).  The Framework was authored

by the New England Fishery Management Council, see 78 Fed. Reg. at 26,172, which manages

fisheries off the nation's northeast coast.  See New England Fishery Management Council,

Summary of Northeast Multispecies Fishery Management Plan, available at

http://goo.gl/mBYmcs.  The Framework relates to the region's "groundfish" (or multispecies)

fishery, which covers 13 different species of fish, such as cod, haddock, and flounder, divided into 20 stocks.  See Framework 50 at 27 (AR 27,283); 78 Fed. Reg. at 26,172.

CLF principally contests Framework 50's approach to setting Annual Catch Limits (ACLs).  Under the Magnuson-Stevens Act, each Fishery Management Plan must "establish a mechanism for specifying annual catch limits in the plan (including a multiyear plan), implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery."  16 U.S.C. § 1853(a)(15).  The Plan must also include "measures to ensure accountability" for the ACLs.  Id.  Councils take the first stab at setting ACLs, which must then be approved by the Service.  See id.; id. at §§ 1854(a), (b).  In doing so, Councils do not operate alone.  Rather, under the Act, each Council must establish a "scientific and statistical committee" that issues "recommendations for acceptable biological catch, preventing overfishing, maximum sustainable yield, and achieving rebuilding targets" for the fishery.  16 U.S.C. § 1852(g)(1)(A)-(B).  Based on those recommendations, among other things, the Council must "develop annual catch limits for each of its managed fisheries that may not exceed the fishing level recommendations of its scientific and statistical committee" unless a separate peer-review process is initiated.  16 U.S.C. § 1852(h)(6).

Under the Service's current Guidelines, the ACL is limited by the Committee's recommendation for "acceptable biological catch" (ABC).  In its Guidelines, the Service reasons that the "recommendation that is the most relevant to ACLs is ABC" because "both ACL and ABC" – unlike other recommended metrics – "are levels of annual catch."  50 C.F.R. § 600.310(b)(2)(v)(D).  ABC is the level of annual catch that would prevent overfishing, buffered below the actual overfishing limit to account for some amount of scientific uncertainty in the Committee's estimates.  See id. § 600.310(f)(2)(ii).  ACL is usually buffered further below

the ABC.  Cf. id. § 600.310(f)(2)(iv).  Thus, under the Service's Guidelines, "ACL cannot exceed the ABC."  Id. § 600.310(f)(5).

In Framework 50, the Council set and the Service approved ABCs and ACLs for the 2013 fishing year, which stretches from May 2013 to the end of April 2014.  See 78 Fed. Reg. at 26,177, 26,181-83; 50 C.F.R. § 648.2 ("Fishing year means . . . from May 1 through April 30 of the following year" for the New England groundfish fishery).  Initially, Framework 50 set the ACL for each stock below the recommended ABC for the 2013 fishing year.  See 78 Fed. Reg. at 26,177, 26,181-83.

Later in Framework 50's implementing rule, however, the Service raised the *de facto* catch limits for 13 stocks by tacking on allowable "carryover" catch from 2012.  See Framework 50 Proposed Rule, 78 Fed. Reg. 19,368, 19,384-85 (Mar. 29, 2013); 78 Fed. Reg. at 26,189. Carryover is, in essence, catch that was allocated to fishers but remained uncaught in the prior fishing year.  See 78 Fed. Reg. at 19,384-85.  In the groundfish fishery, the majority of catch is assigned based on a sector system, where groups of vessels or "sectors" share an apportionment of certain stocks of fish, known as the sector's Annual Catch Entitlement (ACE) for each stock. See NOAA, Fisheries Service Fact Sheet: Answers to Commonly Asked Sector Management Questions at 1-3 (2009), available at http://goo.gl/XQTp6e.  When a portion of a sector's ACE remains uncaught, the sector is allowed to carry over up to 10% of its allocation into the next fishing year.  See 50 C.F.R. § 648.87(b)(i)(C).  In the Framework 50 rule, the Service clarified that it planned to allow sectors to use the full 10% carryover, as it had in previous years, in addition to the allocated ACL.  See 78 Fed. Reg. at 19,384-85; 78 Fed. Reg. at 26,189.  It called the new catch limits, which combined ACL and carryover, "total potential catch."  See 78 Fed. Reg. at 19,384.

The 13 new catch limits uniformly exceeded the Committee's recommended ABCs. See 78 Fed. Reg. at 19,384; Framework 50 Environmental Assessment at 190-92 (AR 27,446-48). The Service believed this was acceptable because the ACLs were still set below the ABCs – at least in name – and because the "total potential catch" allotted was still unlikely to result in overfishing. See 78 Fed. Reg. at 26,189, 26,200.

CLF also challenges the process used to set the ACL for Gulf of Maine cod. For that cod stock, the Committee took the unusual step of recommending two different ABC levels. See Memorandum from Scientific and Statistical Committee to Paul J. Howard, Executive Director of the NEFMC at 3 (Jan. 29, 2013) (AR 27,612). While the Committee expressed a preference for the lower level, the Council ultimately opted for the higher ABC. See id.; 78 Fed. Reg. at 26,177. In addition, because the Gulf of Maine cod population has not been rebuilding as expected, the Service has taken several emergency measures over the last two fishing years. In 2012, the Service exercised its emergency authority to allow more fishing of the cod stock than was recommended, in hopes of easing the burden on fishermen as the stock transitioned to a lower catch limit. See Temporary Rule, 77 Fed. Reg. 25,623, 25,623-24 (May 1, 2012). Such emergency measures can extend for no longer than 366 days under the Act. See 16 U.S.C. § 1855(c). In 2013, by contrast, the Service used its emergency authority to lower the amount of available carryover for Gulf of Maine cod from 10% of a sector's 2012 ACE to 1.85% of that ACE to avoid continued overfishing. See 78 Fed. Reg. at 26,188-89.

Plaintiff Conservation Law Foundation is a non-profit environmental group "with a longstanding interest in protecting New England's ocean and river ecosystems." Pl. Mot., Exh. 3 (Declaration of Peter Shelley) at 2. CLF contends that Framework 50 should be vacated, at least in part, for violating the Magnuson-Stevens Act. After CLF filed its Complaint, the Government

moved to transfer this case and two related cases to the District of Massachusetts, a motion that the Court ultimately denied. See Oceana, Inc. v. Pritzker, No. 13-770, 2013 WL 5801755 (D.D.C. Oct. 28, 2013). Plaintiff has subsequently moved and Defendants have cross-moved for summary judgment; the Court now turns to those Motions.

## II.    Legal Standard

The Magnuson-Stevens Act incorporates the Administrative Procedure Act's familiar "arbitrary and capricious" standard of review. See 16 U.S.C. § 1855(f)(1); 5 U.S.C. § 706(2)(A). Because of the limited role federal courts play in reviewing such administrative decisions, the typical Federal Rule 56 summary-judgment standard does not apply to the parties' dueling Motions. See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006) (citing Nat'l Wilderness Inst. v. United States Army Corps of Eng'rs, 2005 WL 691775, at *7 (D.D.C. 2005)). Instead, in APA and MSA cases, "the function of the district court is to determine whether or not . . . the evidence in the administrative record permitted the agency to make the decision it did." Id. (internal citations omitted). Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review. See Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002) (citing Richards v. INS, 554 F.2d 1173, 1177 (D.C. Cir. 1977)).

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this "narrow" standard of review – which appropriately encourages courts to defer to the agency's expertise, see Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) – an agency is required to "examine the relevant data and articulate a satisfactory explanation for its

action including a rational connection between the facts found and the choice made." Id. (internal quotation marks omitted). In other words, courts "have held it an abuse of discretion for [an agency] to act if there is no evidence to support the decision or if the decision was based on an improper understanding of the law." Kazarian v. U.S. Citizenship and Immigration Services, 596 F.3d 1115, 1118 (9th Cir. 2010).

It is not enough, then, that the court would have come to a different conclusion from the agency. See Nat'l Ass'n of Home Builders v. Norton, 340 F.3d 835, 841 (9th Cir. 2003). The reviewing court "is not to substitute its judgment for that of the agency," id., nor to "disturb the decision of an agency that has examine[d] the relevant data and articulate[d] . . . a rational connection between the facts found and the choice made." Americans for Safe Access v. DEA, 706 F.3d 438, 449 (D.C. Cir. 2013) (internal quotation marks and citation omitted). A decision that is not fully explained, moreover, may be upheld "if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974).

## III. Analysis

CLF challenges three aspects of Framework 50 and its implementing rule. First, it contests the Service's authority to set *de facto* catch limits above the Scientific and Statistical Committee's recommended parameters. Next, Plaintiff argues that the Council and the Service lacked the authority to choose the higher of the Committee's two recommended catch limits for Gulf of Maine cod. Finally, CLF claims that allowing any carryover catch for Gulf of Maine cod in 2013 was unlawful. The Court addresses each argument in turn.

A.  ACLs Exceed Committee Recommendations

Plaintiff begins by asserting that the Service's catch limits exceed the expert recommendations of the SSC, contrary to the demands of the Magnuson-Stevens Act.  Under the Act, the Council and the Service must "establish a mechanism for specifying annual catch limits" to prevent overfishing.  16 U.S.C. § 1853(a)(15).  Those ACLs "may not exceed the fishing level recommendations of [the Council's] scientific and statistical committee."  16 U.S.C. § 1852(h)(6).  The Committee's recommendations come in four varieties: "recommendations for [1] acceptable biological catch, [2] preventing overfishing, [3] maximum sustainable yield, and [4] achieving rebuilding targets" for the fishery.  16 U.S.C. § 1852(g)(1)(B).  In practice, the ACL is limited by the Committee's recommendation for "acceptable biological catch."  See 50 C.F.R. § 600.310(f)(5).  As the law requires, the Council recommended and the Service approved ACLs for the 2013 fishing year that did not exceed the Committee's recommended ABCs.

The Council, however, did not consider so-called carryover catch when setting ACLs for 2013.  Carryover catch, as described in a 2010 Amendment to the groundfish Plan, "allow[s] sectors to carry-over unused ACE" – that is, a sector's individual slice of the fishery's ACL – "into the next fishing year."  Amendment 16 § 7.2.1.2.3.4 (AR 886).  The amount of allowable carryover is "limited to ten percent of the [sector's allocated] ACE."  Id.  As the Service has noted, however, "Neither Amendment 16, nor the implementing regulations . . . clarified how allowed carryover was to be accounted for in light of ACEs and ACLs and [Accountability Measures]."  78 Fed. Reg. at 26,189.  As a result, for the last several years the Council and the Service have been allowing carryover above the ACLs to create an even larger amount of permissible catch.  See 78 Fed. Reg. at 19,384.  Recently, the Service invented a name for the new catch limit: "total potential catch," which is the ACL for a stock of fish plus the allowable

9

carryover.  78 Fed. Reg. at 26,188.  In past years, the total potential catch has not exceeded the

recommended ABCs.  See 78 Fed. Reg. at 19,384; Framework 50, Appendix V at 2-4 (AR

27,780-82) (noting that, while total potential catch has previously exceeded the ACLs, this year

it exceeds even the ABCs).  For fishing year 2013, however, the total potential catch does exceed

the Committee's recommended ABC.  See Framework 50 Environmental Assessment at 190-92

(AR 27,446-48).  The Service nevertheless approved the proposed ACLs and allowed the full

amount of available carryover catch.  See 78 Fed. Reg. at 26,188-89.  This is where CLF

contends the Service erred.

Before addressing Plaintiff's argument, however, the Court must ensure that it has the

ability to do so.  The Government identifies two jurisdictional hurdles to Plaintiff's cause:  First,

it claims that CLF does not have standing to challenge Framework 50's carryover provision.

Next, Defendants argue that the carryover issue is prudentially moot.  The Court considers each

jurisdictional issue separately before proceeding to the merits.

### 1. *Standing*

To have standing to bring a lawsuit in federal court, a plaintiff must establish that: (1) it

has suffered an injury in fact; (2) its injury is fairly traceable to the allegedly unlawful conduct;

and (3) a favorable ruling would redress its injuries.  International Broth. of Teamsters v. Dep't

of Transp., 724 F.3d 206, 211 (D.C. Cir. 2013) (quoting Lujan v. Defenders of Wildlife, 504

U.S. 555, 560-61 (1992)).  The Service contends that CLF lacks standing because its real injury

was not caused by Framework 50 but rather by Amendment 16, which applied the concept of

carryover to sectors and thus allegedly led to the overages at issue here.  If CLF had wanted to

challenge carryover, the Government contends, it should have filed suit in 2010, when

Amendment 16 went into effect.  Now it is simply too late.

Broken down, the Government's argument goes like this: To begin, "Amendment 16 mandates carryover." Def. Mot. at 14. That is, if a sector leaves a portion of its ACE unused (up to 10%), then the Service <u>must</u> allow that ACE to be carried over under Amendment 16. Once the ACLs are set, if the ACLs and the carryover combined exceed the ABC, then there is nothing to be done. So, the argument goes, Amendment 16 caused the overages at issue here, not Framework 50.

One might quibble with the Service's interpretation of the carryover provision as mandatory, given that Amendment 16 itself merely "propose[d] to <u>allow</u> sectors to carry-over unused ACE into the next fishing year," Amendment 16 § 7.2.1.2.3.4 (AR 886), and the accompanying regulation simply noted that "a sector <u>may</u> carry over <u>up to</u> 10 percent of unused ACE for each stock into the following fishing year." 75 Fed. Reg. at 18,339 (emphasis added). In any event, even if the Amendment mandated the full 10% carryover, the Service's legal conclusion still does not follow. While the amount of carryover may be prescribed, Amendment 16 did not determine how that carryover should be accounted for in setting ACLs. <u>See</u> Amendment 16 at 505 (AR 886); 78 Fed. Reg. at 26,189 ("Neither Amendment 16, nor the implementing regulations . . . clarified how allowed carryover was to be accounted for in light of ACEs and ACLs and [Accountability Measures]"). In fact, the Amendment noted that <u>ignoring</u> carryover when setting catch limits could result in overfishing – which, of course, would be unlawful under the Act. <u>See</u> 16 U.S.C. § 1853(a)(15). To avoid this outcome, the Amendment recommended that "ACE carry-over . . . be considered when setting the ACL for sectors." Amendment 16 § 7.2.1.2.3.4 (AR 886-87). In other words, the Council could buffer the ACL (or sub-ACL for sectors) far enough below the ABC to account for carryover each year. <u>See</u> <u>id.</u> With lower ACLs, the addition of carryover would not cause ABC overages. <u>See</u> <u>id.</u> To the

extent the Service argues that Amendment 16 would inevitably lead to ABC overages and should have been challenged in 2010, it is simply wrong. That conclusion is bolstered by the fact that carryover has never before caused the ABCs to be exceeded. See 78 Fed. Reg. at 19,384. Put another way, until 2013 – when this suit was filed – CLF suffered no alleged injury on account of carryover.

Instead, several choices made by the Council and approved by the Service in Framework 50 created the injury alleged here: First, the Council did not take carryover into account when setting ACLs and ACEs. See 78 Fed. Reg. at 26,179-83. Second, those ACLs were set so close to the ABCs that when carryover was added, the ABCs were exceeded. See Framework 50 Environmental Assessment at 190-91 (AR 27,447-48). Finally, the Service did nothing to mitigate the situation, but rather approved the recommended ACLs and tacked on the full amount of allowable carryover as usual. See 78 Fed. Reg. at 26,189. This resulted in a total potential catch that, for the first time, exceeded the recommended ABCs. Each of those choices was made in Framework 50, and so that Framework is properly considered the cause of Plaintiff's harm. Vacating and remanding the Framework or portions thereof would redress that harm, and so CLF has standing to sue. Lujan, 504 U.S. at 560-61.

## 2. *Prudential Mootness*

Next, the Service asserts that Plaintiff's challenge is moot. The Government does not appear to contend that this case is moot in the constitutional sense – nor could it, since the alleged excessive fishing is still occurring and thus CLF's injury endures. Rather, despite the existence of an ongoing injury, the Service claims that this suit is prudentially moot because the Service has revised its carryover approach for the upcoming fishing year, which begins in May

2014. According to the Government, there would thus be little use in reforming its soon-to-be-outdated policy for FY 2013. See Def. Mot. at 12-13.

Prudential mootness invokes "a melange of doctrines relating to the court's discretion in matters of remedy and judicial administration. Unlike Article III mootness, these doctrines address not the power to grant relief but the court's discretion in the exercise of that power." Chamber of Commerce v. DOE, 627 F.2d 289, 291 (D.C. Cir. 1980) (internal citation omitted). Prudential mootness concerns often arise when a defendant has ceased its allegedly illegal conduct and is reconsidering or has reconsidered the policy that created the harm in the first place. See id.; see also United States v. W.T. Grant Co., 345 U.S. 629, 632-36 (1953). While injunctive relief could hypothetically prevent future harm in such circumstances, in reality it would serve little purpose. "Mootness doctrine exists" in part "to ensure that we offer opinions only when doing so 'will have some effect in the real world.'" Wyoming v. U.S. Dep't of Interior, 587 F.3d 1245, 1250 (10th Cir. 2009) (quoting 13B Wright, Miller & Cooper, Federal Practice and Procedure § 3533.1, at 751 (3d ed. 2008)). Where injunctive relief would likely have no impact, a court is free to stay its hand.

Here, however, an injunction would undoubtedly "have some effect in the real world." Id. After all, the Service has not yet ceased its allegedly unlawful conduct. Fishing year 2013 extends until the end of April 2014, and so fishing in excess of the recommended ABCs may continue for the next several weeks. See 50 C.F.R. § 648.2 (defining fishing year). Vacatur and remand could halt that excessive fishing and, under the fishery's current regulations, could force sectors to "pay back" any overages incurred this year by catching fewer fish in FY 2014. See 50 C.F.R. § 648.87(b)(1)(iii) ("Should an ACE allocated to a sector be exceeded in a given fishing year, the sector's ACE shall be reduced by the overage on a pound-for-pound basis during the

following fishing year"); id. § 648.90(a)(5) (same result "if any of the ACLs specified in paragraph (a)(4) of this section are exceeded"). In a case where harm is ongoing and relief would be effective, the Court is not obligated to step aside, nor have courts made a habit of doing so – even where a case might become moot shortly. See, e.g., Crawford v. FCC, 417 F.3d 1289, 1294-95 (D.C. Cir. 2005) (deciding case where FCC action had effectively mooted claim, but FCC's mooting decision had not technically become final); see also Muniz v. Sabol, 517 F.3d 29, 34 (1st Cir. 2008) (controversy "clearly not moot" even where the requested relief would have occurred within a few weeks regardless of the case's outcome); League of United Latin American Citizens v. Bredesen, 500 F.3d 523, 530 n.5 (6th Cir. 2007) (deciding case where superseding legislation would inevitably moot controversy, but law did not take effect for another month).

Here, the Court follows the ordinary rule, under which it need not "dismiss a live controversy as moot merely because it may become moot in the near future." Hunt v. Imperial Merch. Servs., Inc., 560 F.3d 1137, 1142 (9th Cir. 2009). Rather, as the Supreme Court has held, as long as a regulation or statute "remain[s] in effect," then "the case has not become moot, whatever the ultimate disposition of" pending reforms. Lewis v. BT Inv. Managers, Inc., 447 U.S. 27, 53 n.15 (1980); see also Defenders of Wildlife v. Jackson, 791 F. Supp. 2d 96, 110 (D.D.C. 2011) (claim not moot where an "effective remedy is possible and appropriate" because agency action at issue was still in force) (internal quotation marks omitted). The rule at issue here remains in effect and continues to create the alleged harm, even if the Service's new policy might prevent future injury. Because the Court can offer meaningful relief – both in terms of blocking fishing this year and affecting ACEs and ACLs next year – it will reject Defendants' mootness argument and proceed to the merits of the case.

3. *Merits*

In this challenge to Framework 50, CLF argues that the Service erred by setting *de facto* ACLs for 2013 that exceed the catch limits recommended by the Scientific and Statistical Committee. The Service concedes that, under the plain language of the Magnuson-Stevens Act, ACLs "may not exceed the fishing level recommendations of [the Council's] scientific and statistical committee," specifically the recommendation for acceptable biological catch. 16 U.S.C. § 1852(h)(6); <u>see</u> 50 C.F.R. § 600.310(f)(5).

CLF contends that the Service failed to comply with the plain language of the Act, even under <u>Chevron</u>'s deferential approach. <u>See</u> <u>Chevron USA, Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 842-45 (1984) (requiring deference to agency's reasonable interpretation of governing statute). To be sure, the Service and the Council followed the letter of the law when setting their <u>initial</u> ACLs for 2013. In determining those baseline ACLs, the Council took the Committee's recommendations – which suggested significantly lower fishing limits than previous years – to heart. <u>See</u> 78 Fed. Reg. at 26,176, 26,179-83; NEFMC Council Meeting Materials, Framework 50 Final Action at 2 (AR 18,439). In an effort to soften the blow of the lowered limits, however, the Service allowed sectors to carry over up to 10% of their unused catch entitlement from 2012, as Amendment 16 permits. <u>See</u> 78 Fed. Reg. at 19,384; NOAA Fisheries, Statement on 2013 Groundfish Fishery Quota Carryover from John K. Bullard, Northeast Region Administrator 1 (AR 19,566). That carryover amount, which was not accounted for in the computation of the original catch limits, was added to the baseline ACLs. <u>See</u> 78 Fed. Reg. at 26,189. The resulting amount of allowable catch exceeded the Committee's recommended parameters for 13 stocks of fish. <u>See</u> Framework 50 Environmental Assessment at 190-92 (AR 27,446-48).

Common sense would indicate that this procedure – which resulted in catch limits above the statutorily permissible levels – contravenes the plain language of the Act. But the Service contends that this is not so. Rather, the Government argues that the new, higher-than-recommended catch levels are perfectly legal <u>because the Service did not call them "annual catch limits</u>." <u>See</u> 78 Fed. Reg. at 26,200. After all, it is only "annual catch limits" that "may not exceed the fishing level recommendations" of the Committee. 16 U.S.C. § 1852(h)(6). These final fishing allocations, conversely, are not ACLs; instead, the Service called them "total potential catch." 78 Fed. Reg. at 26,188. That's right: According to the Service, the statutory limits on its authority apply only when it says the magic words. Express limits set by Congress are, under the Service's theory, mere verbiage, easily circumvented through clever use of a marine thesaurus.

That, of course, is not how statutes work. In its legislation, Congress typically says what it means and means what it says. <u>See</u> <u>Connecticut Nat. Bank v. Germain</u>, 503 U.S. 249, 253-54 (1992). In the 2007 revisions to the Magnuson-Stevens Act, Congress fundamentally altered American fishing regulation by requiring regional fishing Councils to set hard, science-based caps on how many fish could be caught each year and by demanding that accountability measures be triggered when fishermen exceeded those caps. <u>See</u> Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, sec. 103, 104, Pub. L. No. 109-479, 120 Stat. 3575, 3580, 3584; S. Rep. No. 109-229, at 1, 3, 6-7 (2006) (Due to overfishing, Congress "needed to require that: (1) scientifically established annual catch limits be set and adhered to in each managed fishery, and (2) any catch in excess of that limit (overages) should be deducted from the following year's catch limit through appropriate management measures."). Congress called those caps "annual catch limits" and built its new accountability system around

them.  See, e.g., 16 U.S.C. §§ 1853(a)(15), 1852(h)(6).  That system was necessary because the prior regime – which was less data driven – had resulted in continued overfishing.  See S. Rep. No. 109-229, at 6-7.  In other words, annual catch limits were clearly important to Congress in 2006 when it drafted this bill, and, as a result, the legislature placed strict limits on the Service and the Council's method for setting them and on fishers' ability to exceed them.  See 16 U.S.C. §§ 1853(a)(15), 1852(h)(6).

Congress did not define the term "annual catch limit," and the Service's definition is manifestly unhelpful.  See 50 C.F.R. § 600.310(f)(2)(iv) (describing ACL as "the level of annual catch of a stock or stock complex that serves as the basis for invoking [accountability measures]").  When statutory terms are undefined, courts interpret them "as taking their ordinary, contemporary, common meaning."  Sandifer v. U.S. Steel Corp., 134 S. Ct. 870, 876 (2014) (internal quotation marks omitted); see also Burrage v. United States, 134 S. Ct. 881, 887 (2014) ("The Controlled Substances Act does not define the phrase 'results from,' so we give it its ordinary meaning.").  The Oxford English Dictionary defines a "limit" as "a bound which may not be passed, or beyond which something ceases to be possible or allowable." Oxford English Dictionary, http://www.oed.com (last visited Apr. 3, 2014).  "Annual," of course, means "yearly," and "catch" denotes the "number of fish caught at one time, or during one season."  Id. Thus, when the Service sets bounds on the number or amount of fish that can be caught in a year, it is – in the ordinary sense of the term – setting an annual catch limit.  In prescribing "total potential catch" – the true upper bound on fishing for 2013 – the Service was undoubtedly setting an annual catch limit within the plain meaning of those words.

The Service argues that it could not possibly have set new ACLs in the Framework 50 rule when it determined the "total potential catch" because the statute does not permit the Service

to unilaterally set ACLs.  See Def. Opp. at 7; see also 16 U.S.C. §§ 1853, 1854.  Nor is the

Service allowed to exceed the recommended ABCs – and yet it did.  The fact that an agency is

not permitted to take a given action does not necessarily mean that the agency will stay within

the bounds of its appointed authority.

The Court is well aware that, when it comes to technical regulatory language like an

"annual catch limit," courts generally defer to agency expertise.  See Chevron USA, Inc., 467

U.S. at 842-45.  And for good reason.  Agencies, through their vast experience, are far more

likely to comprehend the specific meaning of scientific terms than are courts, and Congress is

generally presumed to delegate authority to the relevant agency when it uses language that is

flexible or vague.  Id.  Even assuming, however, that the Service has defined the term "annual

catch limit" through a formal and deliberative process worthy of deference, see United States v.

Mead Corp., 533 U.S. 218, 226-27, 230-31 (2001), the definition employed here strains the

bounds of reason.  It is simply nonsensical to claim that the ultimate bound set on the amount of

fish caught yearly is not an annual catch limit.  The "total potential catch" plainly is an ACL, and

ACLs may not exceed the Committee's recommended levels.  See 16 U.S.C. § 1852(h)(6).  Here,

the ACLs did.  Framework 50 and its implementing rule therefore violate the Magnuson-Stevens

Act.

The Service also musters several arguments as to why its actions here will not result in

overfishing and how its choices were permitted under existing regulations.  In the end, none of

those arguments matters.  If the Service's actions violate the plain language of the Act –

regardless of whether those actions are good policy or would otherwise be acceptable under the

Service's own regulations – then that is the end of the Court's inquiry.  See Burrage, 134 S. Ct.

at 892 ("The role of this Court is to apply the statute as it is written – even if we think some other

approach might accord with good policy.") (internal quotation marks and alterations omitted);

Atl. City Elec. Co. v. FERC, 295 F.3d 1, 11 (D.C. Cir. 2002) (agency "cannot rely on one of its

own regulations to trump the plain meaning of a statute"). Similarly, the Court need not address

CLF's alternative arguments as to why the *de facto* ACLs are illegal, since its main avenue of

attack has assured its success. Framework 50 cannot endure under the Act.

    B. Gulf of Maine Cod ACL

CLF separately argues that the Council and the Service erred by selecting an ACL that

exceeded the Committee's recommended limit for Gulf of Maine cod. For 2013, the Committee

listed two potential caps for this stock of cod; according to Plaintiff, the Council and the Service

adopted the wrong one. See Memorandum from Scientific and Statistical Committee at 3 (AR

27,612). CLF advances several theories as to why the Council and the Service's choice was

impermissible.

    First, Plaintiff argues that the Committee only recommended one ABC of 1,249 metric

tons for Gulf of Maine cod. Because the Council set and the Service approved an ACL of

1,470 mt, that ACL supposedly exceeded the Committee's recommendation. See 78 Fed. Reg. at

26,181-83. The problem with this argument is that it misstates the facts. In reality, the

Committee took the unusual step of recommending two alternative ABCs for the Council to

choose from based on two different scientific models, although it noted that it "preferred" the

lower level for various reasons. See Memorandum from Scientific and Statistical Committee at

3 (AR 27,612) ("The SSC agreed with the PDT that the preferred ABC for 2013-2015 should not

exceed 1,249mt, but also includes the second alternative of ABC not to exceed 1,550mt for

2013-2015 in our recommendation for reasons outlined below."). In reality, an "ABC of

1,550mt" – not 1,249 mt – was "the maximum the SSC endorse[d] based on the PDT analysis,

but [the SSC] urge[d] the Council to consider the 1,249mt alternative in order to conserve the stock and enhance the likelihood of rebuilding." Id. Because the Committee recommended an ABC of 1,550 mt, and because the ACL was set below that limit, the Service complied with the Act's command that ACLs be set below the recommended ABC. See 16 U.S.C. § 1852(h)(6).

Second, CLF contends that the 2013 ACL for Gulf of Maine cod violates National Standard 2, which requires that "[c]onservation and management measures . . . be based upon the best scientific information available." Id. § 1851(a)(2). In essence, Plaintiff argues that the SSC always makes its recommendations based upon the best known scientific information, so if the Council did not adopt the Committee's preferred alternative, then it was not basing its decision on the best science. Yet, the Committee evaluated and recommended both ABCs, and in its estimation both models were based on the best possible research. See Memorandum from Scientific and Statistical Committee at 3 (AR 27,612). As the Committee itself noted, "[B]oth alternatives appropriately use the assessment outcomes and account for scientific uncertainty," and "either value represents a substantial reduction in recent harvest, and is expected to promote rebuilding more than recent level of catch have allowed." Id. Adopting either recommendation, accordingly, would comport with the best available science under CLF's definition. The Service therefore complied with National Standard 2.

Third, Plaintiff asserts that the cod ACL violates National Standard 1, which demands that "[c]onservation and management measures . . . prevent overfishing." 16 U.S.C. § 1851(a)(1). CLF notes that the Service's previous efforts have failed to prevent Gulf of Maine cod overfishing, that there is significant scientific uncertainty regarding this population, and that the model used by the Committee to arrive at the higher ABC is not the economic model the Committee typically uses. All of this is true. But the Committee – which is the scientific expert

here – ran the numbers, accounted for the aforementioned scientific uncertainty, and determined that both models and both recommended ABCs would prevent overfishing. See Memorandum from Scientific and Statistical Committee at 3 (AR 27,612). None of Plaintiff's concerns undermines that analysis. In addition, either recommendation represents a steep downward departure from previous fishing limits – which increases the likelihood that the new caps will prevent overfishing. Id. The cod ACL thus comports with National Standard 1.

Fourth, CLF complains about the allocation of carryover catch for Gulf of Maine cod. The carryover argument was addressed in part above, see Section III.A.3, *supra*, and is addressed in the next Section as well. See Section III.C, *infra*. The Court has already found that the allowance of carryover is illegal to the extent that it exceeds the ABCs; any relief the Court affords should thus address CLF's concerns about Gulf of Cod carryover.

Fifth and finally, Plaintiff claims that it was arbitrary and capricious for the Council and the Service to prioritize cost to fishermen over conservation measures by choosing the higher ABC. But the Service did not prioritize cost over conservation, since either ABC was designed to meet conservation objectives. See Memorandum from Scientific and Statistical Committee at 3 (AR 27,612). In such a situation, the National Standards actually encourage the Service and the Council to take cost into account, to the extent practicable. See, e.g., 16 U.S.C. § 1851(a)(7) ("minimize costs and avoid unnecessary duplication"); id. § 1851(a)(8) ("minimize adverse economic impacts"). Considering cost to industry, then, was a reasonable decision. The ACL for Gulf of Maine cod must remain in place.

C.  Emergency Measures

CLF's final argument is that, by allowing some carryover for Gulf of Maine cod from FY 2012, the Service impermissibly extended emergency measures that raised the fishing limit for cod last year.

The Magnuson-Stevens Act allows the Service to take emergency or interim measures to reduce, rather than end, overfishing of a stock of fish for a maximum of 366 days.  See 16 U.S.C. § 1855(c)(1), (3).  That is, both parties here agree that the Act permits continued (if reduced) overfishing in limited situations.  In 2012, the Service used this emergency authority to raise catch limits and temporarily allow continued overfishing of Gulf of Maine cod.  See 77 Fed. Reg. at 25,623-30.  Overfishing under these higher-than-recommended ACLs lasted for the full 366 days.  See Temporary Rule Extension, 77 Fed. Reg. 65,326 (Oct. 26, 2012).

This year, as explained above, the ACL set for Gulf of Maine cod is much lower and comports with the Committee's recommendations.  Calculating carryover for this stock, however, proved problematic.  Allowing the full 10% of available carryover from the 2012 catch limits would not only have exceeded the recommended ABCs, but would also have caused Gulf of Maine cod to be overfished.  See 78 Fed. Reg. at 26,188-89.  As a result, the Service attempted to determine what amount of carryover from 2012 would have been available in the absence of its emergency measures.  See Framework 50, Appendix V, Section 2.1.3 (AR 27,785).  In doing so, it calculated a hypothetical, non-emergency ACL and ACEs for 2012 and then determined how much carryover would have been permitted under a non-emergency regime.  Id.  Using those calculations, the Service determined that 1.85% of the emergency 2012 ACEs would be the same as 10% of the ACEs in the absence of emergency measures.  Id.  The

Service therefore took yet another emergency action – this time an action to prevent overfishing – to allow only 1.85% carryover for Gulf of Maine cod in 2013. See 78 Fed. Reg. at 26,188-89.

CLF, however, is not satisfied. It claims that, but for the emergency measures in 2012, sector vessels would have no Gulf of Maine cod carryover left at all. In other words, in a world where the catch limits had not been raised, sectors would have spent their entire cod allocation and would have no remaining catch to roll over into 2013. Cf. Framework 50, Appendix V, Section 2.1.3 (AR 27,785) (outlining the likely non-emergency 2012 sector sub-ACL of 656 mt). CLF thus claims that the Service's use of 1.85% carryover constitutes an extension of its emergency measures in violation of the statute's time limit.

The section of the Act governing emergency actions states that no emergency or interim measure "shall . . . remain in effect" for more than 366 days. 16 U.S.C. § 1855(c)(3)(b). The question, then, is whether the Service allowed the measure to "remain in effect" simply by taking the emergency ACL into account in subsequent actions. Because CLF offers no caselaw on the subject, the Court is guided by the plain meaning of the statute's words. Here, the rule's emergency-level ACLs expired at the end of 366 days, as the Act requires. See 77 Fed. Reg. 65,326. The current ACLs for Gulf of Maine cod are much lower. See 78 Fed. Reg. at 26,181-83. In this sense, the Court cannot say that the emergency measures raising the ACL for cod "remain in effect" in the ordinary sense of the term. To be sure, but for those emergency measures, there might be no Gulf of Maine carryover in 2013. The Service certainly took the emergency measures into account when approaching carryover for 2013. But taking account of or otherwise responding to the 2012 rule does not mean that it "remains in effect" in 2013. As the Service notes, it would make little sense to say that the emergency action to allow

overfishing "remains in effect" when the Service has, in fact, ended overfishing.  See Def. Opp. at 12-14.

Of course, to the extent the ACLs and carryover combined exceed the ABC for cod, the carryover is already unlawful.

D.  Remedy

Given the deficiencies in Framework 50, the Court must determine the proper remedy: to remand with vacatur, to remand without vacatur, or to vacate with no remand.  At bottom, the Court must decide if there is anything left for the agency to do here, and, if so, whether the current rule should stay in place while the agency amends it.  To assist in clarifying its options and the parties' recommendations, the Court held a hearing on the remedy question on March 18, 2014.

First, the Court considers whether to vacate Framework 50, and whether to do so in whole or in part.  When a court determines that a rule was issued in error, "with little or no prospect of the rule" surviving intact even if it were remanded, "the practice of the court is ordinarily to vacate the rule."  Ill. Pub. Telecomm. Ass'n v. FCC, 123 F.3d 693, 693 (D.C. Cir. 1997); see also Advocates for Highway & Auto. Safety v. Federal Motor Carrier Safety Admin., 429 F.3d 1136, 1151 (D.C. Cir. 2005) ("unsupported agency action normally warrants vacatur").  Still, a "court is not without discretion" and remand without vacatur may be appropriate in certain circumstances, such as when an agency has not properly explained its decision but may save the rule by doing so on remand.  Advocates for Highway & Auto. Safety, 429 F.3d at 1151.  "The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an

interim change that may itself be changed." Allied-Signal, Inc. v. United States Nuclear

Regulatory Comm'n, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal quotation marks omitted).

Here, there can be little "doubt whether the agency chose correctly." Id. The Service's

choice to establish *de facto* ACLs in excess of the Committee's recommendations was plainly

illegal under the language of the statute. See 16 U.S.C. § 1852(h)(6). In such circumstances –

where there is no question that the agency has violated the law and absolutely no possibility of

the rule's survival on remand – the D.C. Circuit has suggested that the rule ought to be vacated.

See Natural Resources Defense Council v. EPA, 489 F.3d 1250, 1261 (D.C. Cir. 2007) ("EPA's

definition of 'solid waste incineration unit' conflicts with the plain meaning of section 129 and

must therefore be vacated") (emphasis added). Indeed, absent compelling circumstances, the

Court sees no reason to allow agency action in excess of its statutory authority to remain intact.

Still, Allied-Signal counsels the Court to consider the "disruptive consequences" of

vacatur. There is no denying that vacatur here would cause some disruption. If the Court were

to vacate the carryover provisions of Framework 50, then the sectors' *de facto* catch limits would

drop – potentially significantly. That would cause commercial fishers to have to revise their

plans for the last few weeks of the fishing year on extremely short notice, lest they be forced to

pay back any overages in the upcoming year. The Court is very sensitive to those concerns,

especially since New England fishermen are not party to this case and thus have had no

opportunity to defend the Service's actions or to explain the import of vacatur on their

livelihood. The Service, nevertheless, noted at the hearing that vacatur should not be terribly

disruptive because sectors have not yet come anywhere close to reaching their combined ACE

for most stocks of fish. See Hrg. Tr. (Mar. 18, 2014) at 4-5; Summary Table Sector Catch

Monitoring, NOAA, http://goo.gl/ThCMX7 (last visited Mar. 27, 2014) (sector sub-ACL over

90% for only two stocks of fish). In other words, vacating carryover would not necessarily cause fishing for most sectors to come to a screeching halt. In addition, when considering the real-world impact of vacatur, the Court should not turn a blind eye to the danger of leaving the current rule in place. Permitting carryover to remain intact increases the likelihood that additional environmental harm, in the form of excessive fishing, will take place over the course of the next month. And this is exactly the sort of harm Congress sought to avoid when it cabined the Council and the Service's discretion in setting ACLs in the first place. In other words, this is not a situation where leaving the rule in place "will do no affirmative harm." Advocates for Highway & Auto. Safety, 429 F.3d at 1151. Because the rule is clearly infirm and because leaving it in place would likely do more harm than good, the Court believes that vacatur is the proper remedy here.

Next, there is the issue of what, exactly, to vacate. Framework 50 and the implmenting rule contain many disparate actions, and only a few discrete provisions violate the law. Because the offending portions of the Framework and rule are isolated and severable, the Court vacates them only in part. See Davis County Solid Waste Management v. EPA, 108 F.3d 1454, 1459 (D.C. Cir. 1997). There is still, though, the question of which part to sever. The Court could, of course, vacate the entire ACL-setting portion of the Framework along with the carryover allocation, since it is the combination of the baseline ACL and the carryover that is causing damage by exceeding the recommended ABC. The Court, however, believes that it would be less disruptive and equally effective to simply vacate the portion of the rule allowing carryover in FY 2013; subtracting carryover alone, after all, would leave the *de facto* ACLs well below the ABCs.

In this litigation, the Service contends that vacating the carryover provision would do no good because Amendment 16 mandates that sectors receive the full available carryover, and Amendment 16 remains in place. The Agency's formal pronouncements on the import of Amendment 16, however – established through notice-and-comment rulemaking – appear to be quite different. In its Interim Final Rule, the Service noted that it wished to make "a clarification and not a change to existing carryover provisions" by explicitly "provid[ing] that the amount of permissible carryover could be reduced, on an annual basis, if requested by the Council." 78 Fed. Reg. at 26,190. That is, it would require no alteration to Amendment 16 to lower the amount of carryover from the 10% maximum to something else. That makes good sense, given the wording of the Amendment 16 carryover regulation, which uses the permissive "may" rather than the mandatory "must": "a sector may carry over up to 10 percent of unused ACE for each stock into the following fishing year." 75 Fed. Reg. at 18,339 (emphasis added).

Perhaps the Service means to argue that, absent action by itself or the Council, Amendment 16 allows sectors to use the full 10% available carryover by default. See Letter from John K. Bullard, Regional Administrator, National Marine Fisheries Service, to Thomas A. Nies, Executive Director, NEFMC (Mar. 1, 2013) (AR 19,677) ("We recognize that, if nothing is done, the current regulations require us to provide 10-percent carryover for all stocks."). Even if that were the case, the Act would mandate that the Service take action where applying the default rule would violate the Act. See 16 U.S.C. § 1854(b) (Service cannot approve regulations that violate the Act); see also Framework 50, Appendix V at 13 (AR 27,791) ("Because the Council did not specify how to account for carryovers . . . NMFS has determined it has the responsibility under Section 305(d) to propose regulations that ensure that the measures of Amendment 16 and Frameworks 48 and 50 can be carried out in a manner consistent with the provisions of the

Magnuson-Stevens Act.").  Instead, the Service went out of its way to confirm that the default

rule would and should apply.  See 78 Fed. Reg. at 26,189.  Because the Court does not read

Amendment 16 to mandate the full 10% carryover allowance, Defendants are fully capable of

adjusting the numbers to comply with the demands of the Act.

  That, then, brings the Court to the issue of remand.  When an agency commits a legal

error, a court "normally remand[s] . . . to the agency."  Fogg v. Ashcroft, 254 F.3d 103, 111

(D.C. Cir. 2001).  The one exception is where "remand would be futile."  Id.  Here, remand

would be anything but futile.  Because the Court has vacated the agency's allowance of the full

10% carryover, the Service must now take action to ensure that the catch allotted by the ACLs

and carryover combined (or "total potential catch") sits below the recommended ABCs.  The

Court trusts that the Service will notify the industry and commence rulemaking expeditiously.

Even if rulemaking is not completed before the end of the season, though, remand is still

important and useful because of the accountability measures in the New England fishery.  As

CLF notes, "[T]here are 'payback' rules as part of the accountability system in this fishery."  Pl.

Opp. at 8; see 50 C.F.R. §§ 648.87(b)(1)(iii), 648.90(a)(5).  "Thus, if an appropriately set FY

2013 ACL is exceeded, even if that ACL is finalized after the end of the fishing year, then next

year's ACL would be reduced by a like amount, thereby benefitting the stocks."  Pl. Opp. at 8-9.

Even if a new rule is put in place after the end of FY 2013, then, it may still remedy some of the

harm that has occurred as a result of the Service's actions.  For those reasons, the Court will

remand to the Service for further actions consistent with this Opinion.

## IV. Conclusion

  Because portions of Framework 50 and the implementing rule contravene the Magnuson-

Stevens Act, while other challenged portions pass APA review, the Court will grant Plaintiff's

Motion for Summary Judgment in part and deny it in part, and will grant Defendants' Cross-Motion for Summary Judgment in part and deny it in part. The provisions in Framework 50 and its implementing rule allowing sectors to carry over catch from FY 2012 into FY 2013 will be vacated and the rule remanded to the Service. A separate Order consistent with this Opinion will be issued this day.


*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  April 4, 2014